1

2

3

4

5

6

7               IN THE UNITED STATES DISTRICT COURT

8               FOR THE EASTERN DISTRICT OF CALIFORNIA

9    CHARLES CHATMAN,

10              Plaintiff,                    No. 2:06-cv-2912-LKK-EFB P

11        vs.

12   TOM FELKER, et al.,

13              Defendants.            <u>FINDINGS AND RECOMMENDATIONS</u>

14   _____/

15        Plaintiff is a state prisoner proceeding pro se with this civil rights action under 42 U.S.C.

16   § 1983.  All remaining defendants move for summary judgment.  Dckt. No. 77.  For the reasons

17   explained below, summary judgment must be granted in part and denied in part.

18   **I.    Plaintiff's Claims**

19        This action proceeds on the verified amended complaint filed April 18, 2008.  Dckt. No.

20   13.  The court's screening orders pursuant to 28 U.S.C. § 1915A, identified these cognizable

21   claims:

22        1.    Defendant Avila violated plaintiff's First Amendment rights by interfering with

23              his correspondence with an attorney with the U.S. Commission on Civil Rights

24              and a state senator;[1]

25   _____

26        [1] The court has numbered these claims.  The numbers assigned herein do not correspond
     with the numbers assigned by the parties.

2.    Defendant Keating violated plaintiff's right of access to the courts by confiscating and destroying materials that plaintiff was required to submit to at least two different courts, thereby "derailing" the actions plaintiff was pursuing;

3.    Defendants Avila and Keating confiscated and destroyed plaintiff's legal materials in retaliation for plaintiff's filing of grievances;

4.    Defendants Amero, Barcus, Gordon, Grimmond, Park, Patton, Pfat and S. Stiles confiscated plaintiff's property while housed in administrative segregation, in retaliation for plaintiff's filing of grievances;

5.    Defendant J. Stiles falsely stated on official documents that plaintiff had given away his property that in fact had been stolen in order to retaliate against plaintiff for his exercise of First Amendment rights;

6.    Defendants Amero, Hougland, and Ross violated plaintiff's Eighth Amendment rights by leaving plaintiff in a holding cage for five hours while he was handcuffed and wearing only his undergarments and intentionally was exposed to cold winter air coming in through an open door;

7.    Defendants Amero, Hougland, and Ross held plaintiff in the manner set out in claim six in retaliation for plaintiff's having filed grievances against prison officials;

8.    Defendant Rath violated plaintiff's Eighth Amendment rights by using brute force to push plaintiff into a wall when plaintiff was using crutches and had one arm in a sling;

9.    Defendants Felker, McDonald, and Perez maintained an unconstitutional policy of forcing prisoners discharged from the medical clinic to administrative segregation, to walk the one-half mile distance in their undergarments;

10.   Defendants Dillard and Laguna violated plaintiff's Eighth Amendment rights by enforcing this policy and making plaintiff walk from the medical clinic to

1    administrative segregation without[2] crutches in a blizzard wearing only his

2    undergarments;

3    11.    Defendants Dillard and Laguna violated plaintiff's Eighth Amendment rights in

4    the manner described in Claim 10 in retaliation for plaintiff having filed

5    grievances against prison officials;

6    12.    Defendant Koenig violated plaintiff's Eighth Amendment rights by laughing at

7    plaintiff when he arrived in the administrative segregation unit instead of helping

8    plaintiff to warm up and dry off;

9    13.    Defendants James, Cox, Roche, and Harvey violated plaintiff's Eighth

10    Amendment rights by refusing and delaying proper treatment for a medical

11    condition that affects plaintiff's left foot.

12    Dckt. Nos. 16, 24.

13    **II.    Summary Judgment Standard**

14    Summary judgment is appropriate when there is "no genuine dispute as to any material

15    fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary

16    judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant

17    to the determination of the issues in the case, or in which there is insufficient evidence for a jury

18    to determine those facts in favor of the nonmovant. *Crawford-El v. Britton*, 523 U.S. 574, 600

19    (1998); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986); *Nw. Motorcycle Ass'n v.*

20    *U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994). At bottom, a summary judgment

21    motion asks whether the evidence presents a sufficient disagreement to require submission to a

22    jury.

23    ////

24

---

25    [2] The screening order stated this claim as "with crutches" (Dckt. No. 16 at 2), but the
26    amended complaint alleges that plaintiff asked for crutches but that that request was denied.
Dckt. No. 13 at 25-26.

1    The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims

2    or defenses. *Celotex Cop. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, the rule functions to

3    "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

4    trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

5    (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). Procedurally,

6    under summary judgment practice, the moving party bears the initial responsibility of presenting

7    the basis for its motion and identifying those portions of the record, together with affidavits, if

8    any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477

9    U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). If the moving

10   party meets its burden with a properly supported motion, the burden then shifts to the opposing

11   party to present specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e);

12   *Anderson.*, 477 U.S. at 248; *Auvil v. CBS* "*60 Minutes*," 67 F.3d 816, 819 (9th Cir. 1995).

13   A clear focus on where the burden of proof lies as to the factual issue in question is

14   crucial to summary judgment procedures. Depending on which party bears that burden, the party

15   seeking summary judgment does not necessarily need to submit any evidence of its own. When

16   the opposing party would have the burden of proof on a dispositive issue at trial, the moving

17   party need not produce evidence which negates the opponent's claim. *See e.g., Lujan v. National*

18   *Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Rather, the moving party need only point to matters

19   which demonstrate the absence of a genuine material factual issue. *See Celotex*, 477 U.S. at 323-

20   24 (1986). ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

21   issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings,

22   depositions, answers to interrogatories, and admissions on file.'"). Indeed, summary judgment

23   should be entered, after adequate time for discovery and upon motion, against a party who fails

24   to make a showing sufficient to establish the existence of an element essential to that party's

25   case, and on which that party will bear the burden of proof at trial. *See id.* at 322. In such a

26   circumstance, summary judgment must be granted, "so long as whatever is before the district

4

1   court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

2   satisfied." *Id.* at 323.

3        To defeat summary judgment the opposing party must establish a genuine dispute as to a

4   material issue of fact.  This entails two requirements.  First, the dispute must be over a fact(s)

5   that is material, i.e., one that makes a difference in the outcome of the case.  *Anderson*, 477 U.S.

6   at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing

7   law will properly preclude the entry of summary judgment.").  Whether a factual dispute is

8   material is determined by the substantive law applicable for the claim in question.  *Id.*  If the

9   opposing party is unable to produce evidence sufficient to establish a required element of its

10  claim that party fails in opposing summary judgment.  "[A] complete failure of proof concerning

11  an essential element of the nonmoving party's case necessarily renders all other facts

12  immaterial."  *Celotex*, 477 U.S. at 322.

13       Second, the dispute must be genuine.  In determining whether a factual dispute is genuine

14  the court must again focus on which party bears the burden of proof on the factual issue in

15  question.  Where the party opposing summary judgment would bear the burden of proof at trial

16  on the factual issue in dispute, that party must produce evidence sufficient to support its factual

17  claim.  Conclusory allegations, unsupported by evidence are insufficient to defeat the motion.

18  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989).  Rather, the opposing party must, by affidavit

19  or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue

20  for trial.  *Anderson*, 477 U.S. at 249; *Devereaux*, 263 F.3d at 1076.  More significantly, to

21  demonstrate a genuine factual dispute the evidence relied on by the opposing party must be such

22  that a fair-minded jury "could return a verdict for [him] on the evidence presented."  *Anderson*,

23  477 U.S. at 248, 252.  Absent any such evidence there simply is no reason for trial.

24       The court does not determine witness credibility.  It believes the opposing party's

25  evidence, and draws inferences most favorably for the opposing party.  *See id.* at 249, 255;

26  *Matsushita*, 475 U.S. at 587.  Inferences, however, are not drawn out of "thin air," and the

1   proponent must adduce evidence of a factual predicate from which to draw inferences. *American*

2   *Int'l Group, Inc. v. American Int'l Bank*, 926 F.2d 829, 836 (9th Cir.1991) (Kozinski, J.,

3   dissenting) (citing *Celotex*, 477 U.S. at 322).  If reasonable minds could differ on material facts

4   at issue, summary judgment is inappropriate.  *See Warren v. City of Carlsbad*, 58 F.3d 439, 441

5   (9th Cir. 1995).  On the other hand,"[w]here the record taken as a whole could not lead a rational

6   trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*,

7   475 U.S. at 587 (citation omitted).  In that case, the court must grant summary judgment.

8       Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

9   show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

10   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

11   'genuine issue for trial.'"  *Id.*  If the evidence presented and any reasonable inferences that might

12   be drawn from it could not support a judgment in favor of the opposing party, there is no genuine

13   issue.  *Celotex.*, 477 U.S. at 323.  Thus, Rule 56 serves to screen cases lacking any genuine

14   dispute over an issue that is determinative of the outcome of the case.

15       Concurrent with the instant motion, defendant advised plaintiff of the requirements for

16   opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Dckt. No. 77-4;

17   *see Woods v. Carey*, 684 F.3d 934 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir.

18   1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409

19   (9th Cir. 1988).

20   **III.    Analysis**

21   **A.    Claim 1 - First Amendment (Right to Send Mail, Right to Petition the**
         **Government)**

22

23       Plaintiff alleges that around August 2003, defendant Avila prevented plaintiff's mail

24   from leaving High Desert State Prison ("HDSP"), where plaintiff was housed.  The mail was

25   addressed to Attorney Lorraine Stutzman at the U.S. Commission on Civil Rights and State

26   /////

6

1  Senator John Vasconcellos.  Dckt. No. 13 at 9.[3]  Plaintiff claims that the mailings, which

2  allegedly exposed adverse prison conditions, were "confiscated, censored and destroyed without

3  legitimate penological reason."  *Id.*  He further claims that defendant Avila told other prison staff

4  the content of the mailings, which caused plaintiff to suffer daily harassment, "retaliation,

5  humiliation, threats, indignities, assaults, and mental suffering."  *Id.*

6      For the purposes of this motion, defendants concede that, in August 2003, plaintiff

7  submitted to defendant Avila outgoing mail addressed to attorney Lorraine Stutzman and to

8  Senator Vasconcellos.  Dckt. No. 77, Defs.' Stmt. of Undisp. Facts ISO Defs.' Mot. for Summ. J.

9  (hereinafter "DUF") 1.  According to defendants, plaintiff believed that the mail should be sent

10  at the State's expense, but defendant Avila determined that, under the applicable regulation, the

11  mail was not entitled to state-paid indigent postage.  *Id.*  Accordingly, defendant Avila returned

12  the mail to plaintiff on August 29, 2003.  DUF 2, 3.

13      Defendant Avila argues that plaintiff's mail was "confidential" under the pertinent

14  regulations, but not "legal" and thus, not entitled to state-paid postage.  In 2003, indigent inmates

15  were entitled to state-paid postage for five letters per week plus unlimited postage for mailing

16  claims to the Board of Control or filing legal documents to any court.  Cal. Code Regs. tit. 15,

17  § 3134 (2003).  The regulations also provided that an inmate's confidential mail should not be

18  read by any correctional staff and should either be sealed by the inmate or by a staff person in

19  the inmate's presence.  *Id.*, §§ 3141, 3142.  Confidential mail included mail sent to attorneys and

20  state elected officials.  *Id.*, § 3141(c).

21      Plaintiff responds that prior to the August 2003 incident, defendant Avila had processed

22  plaintiff's outgoing mail to senators at the State's expense.  Pl.'s Opp'n to Defs.' Mot. for

23  /////

24  /////

25

26      [3] Page citations herein refer to those assigned by the court's electronic docketing system and not those assigned by the parties.

7

Summ. J., Dckt. No. 88 at 2.[4]  Plaintiff claims that when Avila read plaintiff's mail and learned of his "legal activities" with the Commission on Civil Rights and Senator Vasconcellos, Avila decided to prevent plaintiff's correspondences with them.  *Id.* at 3.  Plaintiff argues that defendant Avila did not know that his letters to Stutzman and Vasconcellos were not legal mail and that, in fact, those individuals "were involved in Plaintiff's civil complaints against many prison officials at High Desert State Prison."  *Id.*  Plaintiff points to a prison policy providing:

> Postage shall be provided for indigent inmate legal/confidential mail that is directed to the Board of Control (BOC), any state or federal court, any person or party required to be served per applicable court rules, the inmate's attorney, any person named in the lawsuit, the Attorney General's Office, Director's Office and Department contract counsel.

Dckt. No. 88 at 56.

Prisoners enjoy a First Amendment right to send and receive mail and to petition the government for redress of grievances.  *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989); *O'Keefe v. Van Boening*, 82 F.3d 322, 325 (9th Cir. 1996); *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995).  However, a prison may adopt regulations that impinge on an inmate's constitutional rights if the regulations are reasonably related to legitimate penological interests.  *Turner v. Safley*, 482 U.S. 78, 89 (1987); *Witherow*, 52 F.3d at 265.  Regulations impacting outgoing mail must more closely fit their purposes than those impacting incoming mail, but in neither instance must the regulation be the least restrictive means of achieving its purpose.  *Thornburgh*, 490

---

[4] Plaintiff's opposition memorandum repeatedly cites to plaintiff's declaration, but no declaration was submitted with the opposition.  *See* Dckt. No. 88.  However, where plaintiff asserts factual information based on his percipient knowledge, the court accepts plaintiff's factual allegations at this stage for purposed of summary judgment analysis, because plaintiff will have the opportunity to establish those facts through his testimony should the case proceed to trial.  *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) ("While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence.").  Further, many of plaintiff's facts allegations are also contained in plaintiff's amended complaint, which is verified.  Because the complaint is verified, it is the equivalent of an affidavit for purposes of summary judgment, to the extent it sets forth information based on plaintiff's personal knowledge with sufficient specificity.  *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1022 (9th Cir. 2010).

1    U.S. at 412; *Witherow*, 52 F.3d at 265.

2           Here, consistent with the Constitution, the regulations and policy provided that certain

3    specific legal mail was entitled to state-paid postage if the sender was indigent. *See Bounds v.*

4    *Smith*, 430 U.S. 817, 824 (1977) (holding that states must provide indigent prisoners with stamps

5    to mail legal documents). Other mail was not entitled to state-paid postage, although an indigent

6    inmate could use one of his five allotted state-paid letters to mail it. These rules did not prevent

7    plaintiff from sending the letters to Stutzman and Vasconcellos, they merely required that

8    plaintiff either pay for the postage or use one of his five allotted free letters. While plaintiff

9    argues that these individuals were "involved in" his litigations, he has not provided any evidence

10   that either individual was acting as his attorney or was a party to any lawsuit he had filed (and

11   thus that his mail was "legal" mail entitled to state-paid postage). Letters sent to state officials

12   and attorneys not representing the inmate are not "legal mail" as defined by the courts. Instead,

13   "legal mail" in the context of the First Amendment generally applies to correspondence between

14   a prisoner and his attorney or mail sent from a prisoner to a court. *See Wolff v. McDonnell*, 418

15   U.S. 539, 575-76 (1974); *Keenan v. Hall*, 83 F.3d 1083, 1094 (9th Cir. 1996). Prisons have a

16   legitimate interest in controlling the amount of postage they provide to indigent inmates.

17   *Semeneck v. Ahlin*, No. 1:09-cv-00566 JLT (PC), 2010 U.S. Dist. LEXIS 125075, at *16 (E.D.

18   Cal. Nov. 16, 2010) (noting that an inmate does not have a constitutional right to free postage

19   simply because he is sending documents to courts, public officers, or lawyers); *Rodriguez v.*

20   *Stone*, No. 1:06-cv-00663-OWW-SMS PC, 2007 U.S. Dist. LEXIS 95879, at *8 (E.D. Cal. Dec.

21   6, 2007) (same); *Shock v. Vonbiela*, No. C-93-3371 MHP, 1994 U.S. Dist. LEXIS 11350, at *2-5

22   (N.D. Cal. Aug. 2, 1994) (granting summary judgment to defendant correctional officer on

23   plaintiff's allegations that the officer refused to provide state-paid postage for plaintiff's letters

24   to a senator). Plaintiff has failed to raise a triable issue that he was constitutionally entitled to

25   state-paid postage for his mail to Stutzman and Vasconcellos.

26   /////

1    Plaintiff's claim that defendant Avila somehow censored his mail to Stutzman and

2    Vasconcellos is not supported by any specific facts (as to what was censored) or corroborating

3    evidence.  Instead, the evidence shows that Avila simply refused to provide state-paid postage.

4    For the reasons stated above, plaintiff has failed to raise a triable issue of fact that

5    defendant Avila deprived him of his First Amendment right to send mail by returning his letters

6    to Stutzman and Vasconcellos for lack of postage.  Accordingly, summary judgment in favor of

7    defendant Avila is appropriate with regard to Claim 1.

8    **B.    Claim 2 - First Amendment (Access to Courts, Confidential Mail)**

9    Claim 2 similarly revolves around a prison official's refusal to provide state-paid postage

10   for plaintiff's mail.  Plaintiff alleges that on or about May 24, 2005, he attempted to mail seven

11   copies of his civil complaint to the Kings County Sheriff for service on the defendants in the

12   action *Chatman v. Rianda*, Kings County Case No. 02CV7140.  *Id.* at 10.  Defendant Keating

13   censored the correspondence outside plaintiff's presence without a legitimate penological

14   purpose and sent it back to plaintiff.  *Id.*  Plaintiff showed defendant Keating a court order

15   directing him to provide the complaints to the Kings County Sheriff for service on the defendants

16   in that action.  *Id.*  Defendant Keating told plaintiff he would not honor the order and later

17   confiscated and disposed of the complaints.  *Id.*

18   Similarly, plaintiff alleges that, on or about August 10, 2005, defendant Keating

19   confiscated 21 copies of plaintiff's civil complaint in *Chatman v. Runnels*, Lassen County Case

20   No. 41597, which plaintiff was attempting to send to the county sheriff for service on the

21   defendants.  *Id.* at 11.  Plaintiff contends that Keating did so in order to obstruct plaintiff's access

22   to the courts and derail his case complaining about prison conditions.  *Id.*  He claims that

23   defendant Keating censored the mailings outside of plaintiff's presence, bragging about his

24   authority to do so.  *Id.*  Defendant Keating additionally placed plaintiff on "copy restriction,"

25   limiting plaintiff's ability to copy court documents for service on defendants.  Six months after

26   confiscating the copied complaints, defendant Keating returned them to plaintiff absent the

manila envelopes addressed to the Lassen County Superior Court into which plaintiff had placed them. *Id.* at 12. Plaintiff was harassed, targeted and assaulted by prison guards who became aware that they were defendants in plaintiff's court cases through defendant Keating's actions. *Id.*

Plaintiff claims that his case *Chatman v. Runnels*, Lassen County Case No. 41597 was dismissed as a result of defendant Keating's refusal to mail plaintiff's complaints for service on defendants. Dckt. No. 15 at 2. Plaintiff says that he became "mentally upset, distressed and aggravated." *Id.*

While much of the allegations as to this claim are not disputed, the relative absence of dispute here weighs against--not in favor of--granting defendants' motion. Defendants do not dispute that plaintiff provided defendant Keating with seven pieces of mail addressed to the Kings County Sheriff, pertaining to the action *Chatman v. Rianda*. DUF 4. Defendant Keating determined that the mail was not confidential and not entitled to state-paid postage. DUF 5. The second incident was similar. Defendant Keating rejected 21 pieces of mail addressed to Ronald D. Jarrell at the Lassen County Courthouse pertaining to *Chatman v. Runnels* as not entitled to state-paid postage. DUF 8, 9. Defendants do not expressly dispute the allegation of plaintiff's verified amended complaint that these items were all copies of his complaints in the actions which were being forwarded according to court instructions for service of process on the defendants. Dckt. No. 13 at 10-11. Rather, as discussed below, defendants argue that the documents plaintiff was attempting to send did not constitute "legal mail" under the applicable regulations.

Prisoners enjoy a First Amendment right of access to the courts. *Bounds*, 430 U.S. at 821. To establish a violation of this right, a plaintiff must show that defendant's conduct caused actual injury to a non-frivolous legal claim. *Lewis v. Casey*, 518 U.S. 343, 348-53 (1996). Conduct that may cause actual injury includes the refusal to provide postage to an indigent inmate to mail legal documents or opening an inmate's legal mail outside his presence (although

the latter is an open question in the Ninth Circuit).  *Bounds*, 430 U.S. at 821; *Sherman v. MacDougall*, 656 F.2d 527, 528 (9th Cir. 1981) (recognizing that the court has not yet decided whether mail from attorneys may be opened outside the presence of the inmate addressee).

Here, the evidence, taken in the light most favorable to plaintiff, shows conduct by defendant Keating that had the potential to impede plaintiff's pursuit of his legal actions. Plaintiff attests that he provided defendant Keating with court orders describing how plaintiff should submit the copies in question so that the summons and complaint could be properly served by the sheriff's office.  Dckt. No. 13 at 10.  While defendants argue that the documents were not addressed "to any court" and thus were not "legal mail" under California Code of Regulations title 15, § 3134, plaintiff was required to mail them to effect service of process.  At the very least, plaintiff has raised a triable issue regarding whether the documents were "legal mail" under both the applicable prison policy and First Amendment jurisprudence (*see supra* discussion of Claim One).  It is difficult to conceive of mail more essential to the progress of litigation than the mailing of complaints for service on defendants as ordered by the court.

With regard to *Chatman v. Rianda*, however, defendants have presented evidence showing that the case was dismissed because plaintiff failed to appear at a case management conference, not because plaintiff was prevented from serving the defendants due to defendant Keating's refusal to provide postage.  Plaintiff does not dispute that the case was dismissed for his failure to appear at a case management conference, although plaintiff believes the dismissal was wrongful.  Dckt. No. 88 at 5.  In fact, in a writ plaintiff filed in this court with regard to *Chatman v. Rianda*, plaintiff attested that the state court had refused to grant him *in forma pauperis* status with regard to service of process fees, ignored his protestations that he could not serve defendants without a fee waiver, and then dismissed the case wrongfully for plaintiff's failure to appear at a case management conference due to "the Hon. Thomas DeSantos bad faith and willful misconduct in office."  Dckt. No. 77-1 at 65-69.  Because plaintiff does not dispute that *Chatman v. Rianda* was dismissed for reasons other than defendant Keating's refusal to

1  provide postage for his complaints, there is no triable issue that defendant Keating's conduct

2  caused actual injury to the case.

3        The court is cognizant of the fact that plaintiff was incarcerated at the time the state case

4  was dismissed for failure to appear.  This suggests the possibility that the dispute over what was

5  or was not "legal mail" (which plaintiff could send without paying the postage himself)

6  somehow interfered with plaintiff's attempts to obtain an order or writ to secure his presence at a

7  court hearing.  The petition filed in this court in 2006 suggests that plaintiff asked to appear at

8  the status conference by phone.  There's nothing showing what the state court did with that

9  request.  It is clear, however, that the state court ordered the case dismissed because plaintiff did

10  not appear.  *See* No. 2:06-cv-2852-JKS-EFB, Petition, Dckt. No. 1 at 75-76.  It is not clear

11  whether this was somehow related to an ongoing beef plaintiff seems to have had with the state

12  court about it not ordering the sheriff to serve his complaint on defendants.  Of importance here,

13  however, is nothing in the parts of the state court record before this court or in plaintiff's federal

14  petition complaining about the state case indicates that defendant Keating or someone else at the

15  institution was frustrating plaintiff's attempts to serve defendants or that such persons somehow

16  prevented plaintiff from appearing at the status conference.

17        With regard to *Chatman v. Runnels*, it is undisputed that plaintiff voluntarily dismissed

18  the case.  DUF 11.  Plaintiff contends that he did so to keep the court from dismissing the case

19  because plaintiff was not serving the defendants.  Dckt. No. 88 at 7.  Defendant Keating argues

20  that he cannot be held responsible for plaintiff's fear that his case would be dismissed.  The

21  argument misses the point.  Plaintiff contends that Keating's obstruction of plaintiff's attempts to

22  mail the documents required to effect service of process on the defendants was the very reason

23  plaintiff was in jeopardy of an order for involuntary dismissal for failure to complete service of

24  process.  Plaintiff claims that he voluntarily dismissed without prejudice to avoid being

25  prejudiced by an order for involuntary dismissal.  Whether he had to do so remains to be

26  determined, but plaintiff has raised a triable issue of fact as to whether defendant Keating

1    obstructed plaintiff's efforts to complete service of process in *Chatman v. Runnels* by refusing to

2    accept for state-paid postage and mailing plaintiff's mail containing copies of his complaints for

3    service on defendants, and if so, whether that obstruction compelled plaintiff to dismiss his

4    action to avoid a dismissal with prejudice.

5        In short, plaintiff has failed to raise a triable issue of material fact that defendant

6    Keating's conduct caused actual injury to *Chatman v. Rianda*, but has raised such an issue with

7    regard to *Chatman v. Runnels*.  Therefore, defendants' motion for summary as to Claim 2 should

8    be granted in part, as to plaintiff's claim that defendant Keating refused to mail out his

9    complaints in *Chatman v. Rianda*, and otherwise denied.

10       **C.    Claim 3 - First Amendment (Retaliation)**

11       In Claim 3, plaintiff alleges that the acts of defendants Avila and Keating as described in

12   Claims 1 and 2 were motivated by an intent to retaliate against plaintiff for filing complaints.

13   Specifically, plaintiff alleges that defendant Keating prevented plaintiff's complaints from

14   leaving HDSP for service to retaliate against plaintiff for engaging in constitutionally protected

15   activity.  Dckt. No. 13 at 12.  Plaintiff further alleges that defendants Avila and Keating knew

16   the contents of plaintiff's mailings and censored and refused to process them because of those

17   contents and not for any legitimate penological purpose.  Dckt. No. 15 at 2.  He alleges that

18   defendants' conduct was allegedly motivated by "the protected conduct [plaintiff] was engaged

19   in" and caused plaintiff to suffer "a chilling effect of governmental action."  Dckt. No. 15 at 2

20   (page 31 of plaintiff's amended complaint, inadvertently omitted from Docket No. 13).

21   According to plaintiff, defendants' conduct resulted in plaintiff's mental suffering, the loss of his

22   legal correspondences, and the dismissal of a court action.  *Id.*  While these allegations are

23   sufficient to state a claim, and thus survive a motion to dismiss pursuant to Rule 12(b)(6), the

24   instant motion is subject to the Rule 56 standards discussed above and it must be determined

25   whether plaintiff has submitted sufficient evidence to establish a genuine issue of material fact.

26   /////

1  "Within the prison context, a viable claim of First Amendment retaliation entails five

2  basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2)

3  because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's

4  exercise of his First Amendment rights, and (5) the action did not reasonably advance a

5  legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).[5]

6  Under the fourth prong, a retaliation plaintiff need not demonstrate that his speech was "actually

7  inhibited or suppressed," because such a requirement would unjustly allow a defendant to escape

8  liability simply because the plaintiff was determined to persist in his protected activity.  *Id.* at

9  568-69.  Instead, the plaintiff must simply show that the defendant's conduct would chill or

10  silence a person of ordinary firmness from future protected conduct.  *Id.*; *Mendocino Envt'l Ctr.*

11  *v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999) (stating that a plaintiff does not need

12  to demonstrate that his exercise of First Amendment rights was chilled, but instead that

13  defendants intended to interfere with plaintiff's exercise of rights).

14  Here, defendants initially argue that the court should defer to "the Institution and its'

15  employees" because retaliation claims are often fabricated, thus, inviting the court to speculate

16  that plaintiff's claims are fabricated.  Dckt. No. 77 at 31-32.  The court must decline this

17  invitation.

18  Defendants next argue that they did not act out of retaliation, and, instead, there was

19  simply a disagreement between the parties as to the proper categorization of plaintiff's mail.

20  Both defendants submit declarations attesting that they did not take the actions alleged by

21  plaintiff to retaliate against him.  Dckt. No. 77-1 at 22 (Decl. of defendant Avila); *id.* at 51 (Decl.

22  of defendant Keating).  In contrast, plaintiff, who bears the ultimate burden of proof on this

23  question, has failed to offer any evidence supporting his claim that defendant Avila refused state-

24  paid postage for his letters to Stutzman and Vasconcellos in retaliation for plaintiff's protected

25

26  [5]Alternatively to the fourth element, the prisoner may simply show that he suffered "harm
   that is more than minimal."  *Id.* at 567 n.11.

1   activity.  Thus, plaintiff fails to demonstrate the existence of a genuine issue of material fact for

2   this claim.  *See Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009) (holding that, in claims

3   alleging retaliation for student speech, to raise a genuine issue of material fact as to whether a

4   defendant took an adverse action because of a plaintiff's protected conduct, a plaintiff must

5   produce evidence that the defendant knew of the plaintiff's protected conduct and either (1) the

6   protected conduct and adverse action were close in time, (2) the defendant expressed opposition

7   to the protected conduct, or (3) the defendant's proffered reason for the adverse act was false or

8   pretextual).

9          As to defendant Keating, however, plaintiff's verified amended complaint attests that

10  defendant Keating "bragged about his authority to do as he will," placed plaintiff on copy

11  restriction, and opened plaintiff's mail so that guards named as defendants in *Chatman v.*

12  *Runnels* and *Chatman v. Rianda* learned of plaintiff's litigation and consequently harassed and

13  assaulted him.  Dckt. No. 13 at 11-12.  Plaintiff testified at his deposition that defendant Keating

14  told plaintiff that he was filing unnecessary complaints.  Dckt. No. 77-1 at 7.  At trial a jury may,

15  or may not find plaintiff's testimony in this regard credible.  But the statement was allegedly

16  made to plaintiff and therefore within his percipient knowledge.  Drawing all inferences in

17  plaintiff's favor, this evidence raises a triable issue as to whether defendant Keating had a

18  retaliatory motive in denying state-paid postage for plaintiff's complaints.

19         Accordingly, as to Claim 3 summary judgment should be granted in favor of defendant

20  Avila, but denied as defendant Keating.

21         **D.      Claim 4 - First Amendment (Retaliation)**

22         In Claim 4, plaintiff alleges that on three separate occasions, when he was placed in

23  administrative segregation, defendants Amero, Barcus, Gordon, Guimond, Park, Patton, Pfadt,

24  and S. Stiles confiscated his property in retaliation for plaintiff's filing of grievances.

25         As to the first incident, plaintiff alleges that: on October 4, 2005, he filed a petition of

26  100-plus signatures with defendant Felker, complaining of defendant Park's "day to day

harassment of inmates within the B-facility, building III housing unit." Dckt. No. 13 at 7. Defendant Felker had defendant Amero interview plaintiff about the petition. *Id.* Defendant Amero allegedly threatened to put plaintiff in administrative segregation for filing the petition with the Warden and told defendant Park over the telephone that plaintiff was a "troublemaker" and that Park should "step up her harassments." *Id.*

According to plaintiff, on or about November 4, 2005, Park retaliated against plaintiff for pursuing the petition against her by confiscating and disposing of plaintiff's eight music compact discs and two books. *Id.* at 13-14. When plaintiff confronted Park about it, she allegedly told him he was lucky that all of his property did not disappear. *Id.* at 14.

As to the second incident, plaintiff alleges that, on or about December 17, 2005, defendant Patton discovered that plaintiff was on a hunger strike. Dckt. No. 13 at 14. Plaintiff was placed in administrative segregation. *Id.* at 14-15. Defendant Patton ordered defendants Barcus and S. Stiles to take plaintiff's property from his cell. *Id.* at 15. The property was placed in boxes and carried to the program office without being inventoried. *Id.* Plaintiff claims that defendants Patton, Barcus, and S. Stiles were angry at plaintiff for alleging that he had been assaulted by staff the day prior. *Id.* They allegedly cursed plaintiff and promised to make his property disappear. *Id.* Plaintiff claims that while he was in the holding cage in the program office, defendants Patton, Barcus, and S. Stiles began to confiscate plaintiff's books, but were stopped by Lieutenant Cummings and defendant Guimond. *Id.* Defendants Patton, Barcus, and S. Stiles reiterated their pledge to make plaintiff's property disappear. *Id.* at 15-16.

Plaintiff alleges that when he was released from administrative segregation in February 2006, he discovered that all of his property was missing, except his legal documents. *Id.* at 16. Plaintiff also claims that defendants Pfadt and Gordon had falsified a property receipt saying that they had inventoried plaintiff's property before his placement in administrative segregation and that plaintiff had refused to sign the property receipt. *Id.* Plaintiff asserts that he never encountered defendant Pfadt before he was placed in administrative segregation, and defendant

1  Gordon did not inventory plaintiff's property while he was in the holding cage awaiting escort to

2  administrative segregation.  *Id.*

3      According to plaintiff, defendants Amero, Pfadt, Patton, S. Stiles, Gordon, Barcus, and

4  Hougland bragged and made fun about their roles in disposing of plaintiff's cosmetics, books,

5  family pictures, stationary, correspondences, prescription glasses, and ink pens.  *Id.* at 17.  These

6  defendants also expressed displeasure at plaintiff for filing complaints against their fellow

7  officers.  *Id.*  Defendant Guimond told plaintiff that he had not participated in the disposal of

8  plaintiff's property but could not go against his fellow officers for taking it.  *Id.*

9      Regarding the third incident, plaintiff alleges that, when defendant Gordon became aware

10  that plaintiff was pursuing litigation against him for his role in the disappearance of plaintiff's

11  property, defendant Gordon told plaintiff that "he was going to do everything within his power to

12  make plaintiff's life miserable."  *Id.* at 18.  On or about May 31, 2006, defendant Gordon entered

13  plaintiff's cell with a trash can and confiscated plaintiff's ink pens, stationary, correspondences,

14  periodicals, greeting cars, legal documents, and half the cotton from plaintiff's mattress.  *Id.* at

15  19.  Defendant Amero was present at the cell door.  *Id.*  Defendants Amero and Gordon regularly

16  teased plaintiff about having taken his property.  *Id.*

17      With regard to all three incidents, plaintiff claims that defendants Park, Amero, Pfadt,

18  Patton, Guimond, Hougland, Barcus, S. Stiles, and Gordon allowed or participated in the

19  confiscation of plaintiff's property to retaliate against plaintiff and deter his complaints against

20  custody staff and not for any legitimate penological purpose.  *Id.* at 32-33.  Plaintiff suffered a

21  chilling effect as a result and also became mentally distressed.  *Id.* at 33.

22      Defendants first argue that plaintiff's entire claim is precluded because plaintiff has

23  already raised it in a state habeas corpus petition, Lassen County Superior Court Case No. CHW-

24  2337.  The state court denied the petition, stating

25      Petitioner, an inmate at High Desert State Prison, alleges that his First
       Amendment rights were violated by the theft of his property in retaliation for
26      making complaints against fellow officers; his Constitutional rights were violated

by prison personnel who falsified documents to justify stealing his property as a retaliatory measure; and his Constitutional rights were violated by prison personnel who covered up their theft of his property in retaliation for petitioner's complaints surrounding staff abuse.  Attached to the petition is a Director's Level Decision dated August 25, 2006 (Local Log # 06-0754) and a copy of the CDCR form 602 (same log) setting forth the issues as to which petitioner exhausted his administrative appeal rights.  Each such document is silent as to a complaint of impairment of a Constitutional right; instead addressing the *negligent* loss of petitioner's property upon his transfer to an Administrative Segregation Unit.  To be considered by a reviewing court, the exact issue must first have been presented [to the administrative agency].  (See *Resources Defense Fund v. LAFCO* (1987) 191 Cal. App. 3rd 886, 894).  The petition for writ of habeas corpus is denied.  (*In re Dexter* (1979) 25 Cal. 3rd 921; *In re Muszalski* (1975) 52 Cal. App. 3rd 500.)

Dckt. No. 77-2 at 15 (emphasis and brackets in original).  As plainly stated in that ruling, the state habeas petition was denied for failure to exhaust administrative remedies.  It did not adjudicate the merits of the underlying claim.

The doctrine of claim preclusion (sometimes referred to as "res judicata") prevents a party from relitigating claims that were or could have been raised in a prior action that was adjudicated on the merits.  *Allen v. McCurry*, 449 U.S. 90, 94 (1980).  Under 28 U.S.C. § 1738, federal courts must accord the preclusive effect to state court judgments as would be accorded under the law of that state.  *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984).

In California, a final judgment in state court may preclude later proceedings based on the same "cause of action," which is defined as: (1) a primary right possessed by the plaintiff, (2) a corresponding primary duty of the defendant, and (3) a harm done by the defendant consisting of the breach of the primary right and corresponding duty.  *Brodheim v. Cry*, 584 F.3d 1262, 1268 (9th Cir. 2009) (citing *City of Martinez v. Texaco Trading & Transp., Inc.*, 3553 F.3d 758, 762 (9th Cir. 2003) and *Citizens for Open Access to Sand and Tide, Inc. v. Seadrift Ass'n*, 60 Cal. App. 4th 1053, 1065 (1998)).  A prior case will bar a subsequent case raising the same cause of action where: (1) the issues decided in the prior suit are identical to those in the subsequent suit, (2) the first suit produced a final judgment on the merits, and (3) the party against whom the

/////

claim was raised was a party or was in privity with a party to the prior suit. *Consumer Advocacy Group, Inc. v. ExxonMobil Corp.*, 168 Cal. App. 4th 675, 685-86 (2008).

It is undisputed that plaintiff's petition in Lassen County was denied for failure to exhaust administrative remedies. A determination that plaintiff did not exhaust his claims is not a determination of the merits of those claims. *Yocom v. Grounds*, No. C 10-3609 SBA, 2012 U.S. Dist. LEXIS 176890, at *8 (N.D. Cal. Dec. 13, 2012); *Brown v. Napa Valley Sch. Dist.*, No. C-11-5673 JCS, 2012 U.S. Dist. LEXIS 69943, at *14-15 (N.D. Cal. May 18, 2012). Accordingly, the Lassen County habeas petition has no preclusive effect on this case.

For the first time in their reply brief, defendants argue that plaintiff has not shown that he has exhausted Claim 4. Defendants contend that the same standard applied by the Lassen County Superior Court applies here. That simply is not the case. The state court faulted plaintiff for failing to allege in his grievance that he believed that his constitutional rights had been violated. There is no generally-applicable requirement under federal law that, to exhaust administrative remedies, a prisoner must identify in his grievance a particular legal theory or even that he believes his constitutional rights have been transgressed. Rather, to properly exhaust, the grievance must contain that level of detail required by the prison's grievance process. *Akhtar v. Mesa*, 698 F.3d 1202, 1211 (9th Cir. 2012) (quoting *Jones v. Bock*, 549 U.S. 199, 218 (2007)). Where, as here, the prison does not instruct inmates on what precisely must be alleged, a grievance suffices to exhaust administrative remedies if it alerts the prison to the nature of the wrong for which redress is sought. *Id.*; Dckt. No. 77-2 at 17 (plaintiff's grievance form). The prison grievance form here instructed plaintiff to "describe problem" and inform officials of the "action requested," but it did not require plaintiff to identify the legal theories underlying his grievance. *Id.* Plaintiff satisfied those requirements. He raised the issue of his missing CDs and other property that had been taken. He identified the issue of what he contends was a false property inventory that he was unwilling to sign. Dckt. No. 77-2 at 17 - 18. He also raised the issue of his being unable to satisfy the service requirements for his summons and

complaint because his mail was not being accepted for mailing.  *Id.* at 2  In the "Action

Requested" portion of his grievance he wrote "to cease and desist from harassing appellant by

threats and refusing to forward his confidential mail to its destination in serving defendants . . . ."

*Id.*  Accordingly, plaintiff's failure to identify a legal theory does not render his grievance

ineffective for exhaustion purposes.

Defendants next argue that plaintiff's retaliation claim against defendant Park regarding

the first incident must fail because the evidence shows that defendant Park did not take any

adverse action against plaintiff.  According to defendant Park, she simply inventoried plaintiff's

property on November 4, 2005 and did not find the eight compact discs and two books.  Dckt.

No. 77, Defs.' Stmt. of Undisp. Facts ISO Mot. for Summ. J. (hereinafter "DUF") 14.

Defendant Park argues that there is no evidence that these items were among plaintiff's property

on that date.  Rather, defendant Park argues that the property inventory form shows that Officers

Schaap and Harrod were both also present for the inventory and that plaintiff refused to note any

missing property on that form.  *Id.*

Plaintiff responds that defendant Park packed his property in five boxes but he only

received four after he arrived in administrative segregation.  Dckt. No. 88 at 7.  Plaintiff argues

that defendant Park further erroneously recorded that she had packed eight boxes, rather than

five, on the inventory form.  *Id.*  Plaintiff states in apparent contradiction that:  (1) Park never

gave him an inventory form to sign, but "took it upon herself to say [plaintiff had] refused" to

sign and (2) plaintiff refused to sign the form because it said his property had been packed in

eight boxes when it had been packed in five.  *Id.* at 7-8.  Plaintiff's cellmate later told plaintiff

that he had seen defendant Park pack the compact discs and books in a separate plastic bag, and

plaintiff has produced a declaration from his cellmate to that effect.  *Id.* at 8, 89.  According to

plaintiff, defendant Park told plaintiff he was lucky she did not make all his property disappear.

/////

/////

*Id.* at 8.  There clearly is a dispute in this regard, but plaintiff's version of the events, and in particular his account of the statement made to him and what he packed and in how many boxes is sufficient to raises a genuine dispute as to whether defendant Park took plaintiff's property.

Defendant Park next argues that summary judgment should be granted on plaintiff's retaliation claim against her because plaintiff refused to sign the inventory form.  Defendant Park contends that, "[i]f Plaintiff reviewed his property to make sure it was all there, Staff would have been able to deal with the items and retrieve any missing property at that time."  Dckt. No. 77 at 36.  Defendant Park further argues that, because plaintiff later accepted the property "as is" upon his release from administrative segregation, his retaliation claim should fail.  Defendant Park offers no legal argument or authority to support these arguments, however.

Lastly, defendant Park argues that plaintiff's retaliation claim against her should fail because there is no evidence that defendant Park took the items *because of* the petition plaintiff filed against her.  Plaintiff has produced evidence that defendant Park knew of the petition, took his property a month later, and told plaintiff he was lucky she did not make more of his property disappear.  While Park is free at trial to present and argue her reasons why a jury should not believe plaintiff's testimony, there are genuine disputes over material issues of fact that preclude summary judgment in her favor.  Drawing all inferences in favor of plaintiff, as is required on this motion, plaintiff's evidence is enough to raise a triable issue as to whether defendant Park took the items in retaliation for plaintiff having filed the petition.  *See Corales*, 567 F.3d at 568. Accordingly, summary judgment of plaintiff's retaliation claim against defendant Park is not warranted.

Defendants Amero, Barcus, Gordon, Guimond, Patton, Pfadt, J. Stiles and S. Stiles argue that plaintiff's retaliation claim against them regarding the second incident should be dismissed because there is no claim in the amended complaint that they confiscated plaintiff's property in retaliation for his protected conduct.  Dckt. No. 77 at 37.  The amended complaint alleges, however, that defendants Patton, Barcus, S. Stiles, and Gordon were angry with plaintiff for

claiming that he was assaulted by staff or for otherwise pursing complaints against staff, that they pledged to make plaintiff's property disappear, and that plaintiff's property did indeed disappear. Dckt. No. 13 at 14-17.  According to plaintiff, defendants Amero, Pfadt, Patton, Stiles, Gordon, and Barcus "bragged and made fun about the role they played in disposing of plaintiff's" property.  *Id.* at 17.  These defendants "expressed their displeasure of plaintiff filing complaints against fellow officers."  *Id.*  The amended complaint further alleges that defendants Amero, Pfadt, and Guimond participated in the theft by failing to intervene to stop it.  *Id.* at 16-19.  These statements suffice to allege that defendants took plaintiff's property in retaliation for his protected conduct.

Defendants next argue that summary judgment should be granted on plaintiff's claims with regard to the second incident because plaintiff has not asserted which specific grievances motivated the defendants to retaliate against plaintiff.  The defendants claim that plaintiff cannot show that they retaliated against him *because of* his filing of grievances without identifying the specific grievances motivating that retaliation.  This argument fails for a number of reasons.  First, plaintiff has alleged that defendants were angry at plaintiff for alleging that he had been assaulted by staff on December 16, 2005.  *Id.* at 14-15.  Second, defendants have cited no authority, and the court is aware of none, that requires a retaliation plaintiff to state so specifically which among several grievances by plaintiff have motivated the alleged retaliation.  The record rather clearly shows that the plaintiff has filed numerous grievances, including grievances proximate in time to the alleged acts or retaliation.  It is certainly conceivable that a defendant could retaliate against a plaintiff for filing multiple grievances, particularly with the frequency of Mr. Chatman, without having any single grievance in mind.  Accordingly, summary judgment on plaintiff's retaliation claim regarding the second incident is not warranted.

With regard to the third incident, defendants again argue that the amended complaint does not allege that the property was taken for a retaliatory purpose.  As summarized above, the amended complaint does so allege:  "When Defendant Gordon became aware that plaintiff were

1   pursuing [sic] litigation against him for his role in the disappearance of his property, . . . [h]e

2   specifically told plaintiff that he was going to do everything within his power to make plaintiff's

3   life miserable." Dckt. No. 13 at 18.  Among the consequent adverse actions plaintiff alleges that

4   defendant Gordon took against him is the May 31, 2006 confiscation of plaintiff's property. *Id.*

5   at 18-19.  Plaintiff alleges that this confiscation served no legitimate penological purpose.  *Id.*

6   Further, plaintiff claims that defendants Gordon and Amero, among others, "allowed, condoned

7   and/or participated in the illegal confiscation of plaintiff's property, as a retaliatory measure to

8   deter custody staff complaints." *Id.* at 32-33.  These allegations suffice to claim that defendants

9   Gordon and Amero took plaintiff's property to retaliate.  Accordingly, summary judgment must

10  be denied as to this claim.

11       **E.       Claim 5 - First Amendment (Retaliation)**

12       Plaintiff alleges that when defendant J. Stiles found out that his wife, defendant S. Stiles,

13  played a major role in disposing of plaintiff's property, he retaliated by knowingly falsifying

14  official documents to reflect that plaintiff gave his property away.  *Id.* at 17.  Plaintiff claims that

15  defendant J. Stiles's conduct was motivated by his intent to retaliate against plaintiff and deter

16  his complaints against custody staff and not for any legitimate penological purpose.  *Id.* at 32-33.

17  Plaintiff alleges that he suffered a chilling effect as a result and also became mentally distressed.

18  *Id.* at 33.

19       Defendant J. Stiles argues that he took no adverse action against plaintiff because he did

20  not falsify documents, citing to the denial of plaintiff's administrative appeal regarding the

21  alleged property thefts.  DUF 61.  That document reveals that defendant J. Stiles interviewed

22  plaintiff about his allegations, that the property inventory form indicated that plaintiff refused to

23  sign it, and that the staff members who packed plaintiff's property (presumably defendants

24  herein) told J. Stiles that they packed everything.  *Id.*; Dckt. No. 77-3 at 47.  Plaintiff claims that

25  defendant J. Stiles falsified plaintiff's interview responses by reporting that plaintiff said that he

26  had given away his property.  Dckt. No. 88 at 11; Dckt. No. 13 at 17.  Plaintiff's evidence,

however, does not show such a falsification.  It does not state that J. Stiles reported that plaintiff

had told him that he gave his property away.  *See* Dckt. No. 88-1 at 29-36.  Instead, the evidence

simply indicates that defendant J. Stiles reported that he told plaintiff he was not allowed to loan

his property to other inmates and should review the inventory sheet when he is placed in

administrative segregation to make sure his property is accounted for.  *Id.* at 34.  As the report

does not contain the false statement plaintiff alleges it does (the alleged adverse act), summary

judgment should be granted in favor of defendant J. Stiles on Claim 5.

F.      **Claim 6 - Eighth Amendment (Conditions of Confinement)**

In Claim 6, plaintiff alleges that, after defendant Amero received a civil complaint from

the Lassen County Sheriff in plaintiff's case *Chatman v. Runnels*, No. 41597, "he promised to

kick plaintiff's ass in reprisal."  Dckt. No. 13 at 20.  On or about November 4, 2005, plaintiff

alleges that he was sitting on the floor of the mess hall when defendants Amero and Ross entered

and told plaintiff to stand up to be cuffed for escort.  *Id.* at 21.  Defendants Amero and Ross

placed plaintiff in handcuffs behind his back despite knowing that plaintiff had medical

documentation indicating that he should be restrained with a waist-chain rather than cuffs.  *Id.*

Defendants Amero and Ross allegedly placed plaintiff, still cuffed, in the holding cage in the

program office.  *Id.*  Defendants Amero and Ross allegedly left plaintiff cuffed up in the holding

cage for over an hour.  *Id.* at 21-22.  Plaintiff claims that defendants Amero, Ross, and Hougland

then took plaintiff's clothes, except for his underwear, and opened the program office door to

expose plaintiff to the freezing outside air for over five hours.  *Id.* at 22.  Plaintiff claims that he

suffered serious injury, including severe pain in his shoulder, wrist and lower back, but the

defendants thought the situation was funny.  *Id.* at 22, 36.

For the purposes of this motion, defendants do not dispute that they left plaintiff

handcuffed in the holding cage for one hour, then removed his clothes "as a precaution so that he

could be examined by an MTA."  DUF 15-17.  Defendants further do not dispute that they did

not return plaintiff's clothes and propped the outside door open.  DUF 18.  According to

1    defendants, defendant Hougland checked on plaintiff every 15 minutes and noted that plaintiff

2    was "ok."  DUF 19.

3           The Eighth Amendment of the U.S. Constitution protects prisoners from inhumane

4    methods of punishment and from inhumane conditions of confinement.  *Morgan v. Morgensen*,

5    465 F.3d 1041, 1045 (9th Cir. 2006).  Extreme deprivations are required to make out a

6    conditions of confinement claim, and only those deprivations denying the minimal civilized

7    measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment

8    violation.  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  Prison officials "must provide humane

9    conditions of confinement," including "adequate food, clothing, shelter, and medical care."

10   *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994).  To succeed on an Eighth Amendment

11   conditions-of-confinement claim, a prisoner must show that (1) the defendant prison official's

12   conduct deprived him or her of the minimal civilized measure of life's necessities (the objective

13   component) and (2) that the defendant acted with deliberate indifference to the prisoner's health

14   or safety (the subjective component).  *Id.* at 834.  To show deliberate indifference, the prisoner

15   must establish that the defendant knew of and disregarded an excessive risk to inmate health or

16   safety; "the official must both be aware of facts from which the inference could be drawn that a

17   substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.

18           "The Eighth Amendment guarantees adequate heating."  *Keenan v. Hall*, 83 F.3d 1083,

19   1091 (9th Cir. 1996).  Exposure to temperature that is merely uncomfortable, however, is not

20   such a serious deprivation as to violate the Eighth Amendment.  *Id.*

21           Defendants argue that leaving plaintiff in the holding cage for five hours exposed to the

22   outside cold weather was not a deprivation sufficiently serious to violate the Eighth Amendment.

23   They argue that the undisputed facts show exposure merely to uncomfortable coldness.  They

24   speculate that because the holding cage was inside the heated program office, leaving the door

25   open for five hours would not make the room intolerably cold.  They do not offer any evidence

26   substantiating their claim that the office was heated that day, to what extent it was heated, or

26

1    what the outside weather was like.  According to plaintiff, the "freezing temperature" caused his

2    feet to hurt and body to become numb.  Dckt. No. 88 at 14.  On this record, the court cannot find

3    as a matter of law defendants are entitled to summary judgment on the issue.

4              Defendants note that plaintiff claims that they were in a smaller closed office in the same

5    larger room that contained the holding cage.  Thus, defendants argue, they were close enough to

6    be affected by the cold and would not have wanted the door open if it had been very cold.

7    (Defendants offer no declarations supporting this claim.  *See* DUF 21.).  It is not apparent that

8    defendants would have felt the cold to the same extent, however, in the small, closed internal

9    office.  Further, plaintiff claims that defendants were wearing winter clothes but had stripped

10   him of all clothes but his undershorts.  Dckt. No. 88 at 14.  These competing claims show that

11   the facts are disputed as to whether defendants Amero, Ross, and Hougland exposed plaintiff to a

12   temperature so cold as to violate the Eighth Amendment.

13             Defendants next argue that they did not act with deliberate indifference by exposing

14   plaintiff to the outside air.  Defendants claim that defendant Hougland noted that plaintiff was

15   "ok" every fifteen minutes.  Defendants further argue that defendants Amero and Ross could not

16   have been aware that the cold was harming plaintiff because they were inside the smaller office.

17   Again, defendants do not offer declarations supporting these arguments.  Contrary to defendants'

18   claims, it is conceivable that these defendants knowingly opened the door to the outside air prior

19   to retiring to the interior office with the intention of exposing plaintiff to freezing temperatures

20   because they knew it would harm plaintiff.  It is further conceivable that defendant Hougland

21   fabricated his 15-minute logs of plaintiff to cover up for his misconduct in opening the door.

22   Defendants have offered only speculation and no evidence that they did not act with deliberate

23   indifference.  As defendants have not discharged their burden of demonstrating that the facts

24   surrounding defendants' mental states are not genuinely disputed, the court cannot grant

25   summary judgment as to Claim 6 on this basis.

26   /////

1    For the first time in their reply brief, defendants address plaintiff's allegations regarding

2    their use of handcuffs.  Defendants argue that plaintiff was handcuffed for only an hour and that

3    "there is no indication" that he suffered an injury from it.  As defendants did not raise this

4    argument in their initial brief, plaintiff has had no opportunity to respond to it.  Accordingly,

5    summary judgment on Claim 6 is not warranted.

6    **G.    Claim 7 - First Amendment (Retaliation)**

7    Plaintiff alleges that defendants Amero, Ross, and Hougland took the actions described in

8    Claim 6 to retaliate against plaintiff for his complaints and court cases against prison officials.

9    Dckt. No. 13 at 22.   Defendants argue that the amended complaint does not allege with enough

10   specificity why these defendants wanted to retaliate against plaintiff.  However, plaintiff has

11   alleged that defendant Amero vowed to assault plaintiff after he learned that plaintiff had named

12   him as a defendant in a civil suit.  Dckt. No 13 at 20.  Plaintiff also states that, during the time he

13   was confined in the holding cage, defendant Hougland told him to "slow down from whinning

14   [sic], bitching, and filing grievances all of the time."  Dckt. No. 88 at 14.  If plaintiff's

15   allegations regarding these alleged statements are credited at trial a reasonable jury could find

16   retaliation. Thus, plaintiff has raised a triable issue as to whether defendants Amero and

17   Hougland acted with a retaliatory purpose.  As to defendant Ross, however, plaintiff has not

18   alleged that he knew of plaintiff's protected conduct or that any other facts exist which would

19   raise an inference that he acted with a retaliatory motive.  *See Corales*, 567 F.3d at 568.

20   Accordingly, summary judgment should be granted in favor of defendant Ross on Claim 7, but

21   denied as to defendants Amero and Hougland.

22   **§H.    Claim 8 - Eighth Amendment (Excessive Force)**

23   Plaintiff alleges that, on or about December 16, 2005, plaintiff objected to defendant

24   Rath's presence at a hearing on a rules violation.  Dckt. No. 13 at 23.  Defendant Rath then

25   allegedly threatened plaintiff with physical harm and later pushed plaintiff into a wall with

26   "brute force" while plaintiff was on crutches, wearing a sling on his left arm, and restrained by a

waist-chain.  Dckt. No. 13 at 23.  Defendant Rath allegedly threatened plaintiff's life and

promised to place him in administrative segregation on "trumped up charges."  *Id.*

"When prison officials use excessive force against prisoners, they violate the inmates'

Eighth Amendment right to be free from cruel and unusual punishment."  *Clement v. Gomez*, 298

F.3d 898, 903 (9th Cir. 2002).  In order to establish a claim for the use of excessive force in

violation of the Eighth Amendment, a plaintiff must establish that prison officials applied force

maliciously and sadistically to cause harm, rather than in a good-faith effort to maintain or

restore discipline.  *Hudson*, 503 U.S. at 6-7.  In making this determination, the court may

evaluate (1) the need for application of force, (2) the relationship between that need and the

amount of force used, (3) the threat reasonably perceived by the responsible officials, and (4)

any efforts made to temper the severity of a forceful response.  *Id.* at 7.

Defendant Rath argues that plaintiff became belligerent in voicing his objection to

defendant Rath's presence and was removed from the hearing for that reason.  DUF 58.

Defendant Rath noted this in the hearing report.  DUF 59.  From this, defendants conclude that

"Defendant Rath's actions were clearly to restore discipline to allow the Administrative hearing

to continue, not to cause harm to the plaintiff."  Dckt. No. 77 at 56.  The record before the court,

however, does not so easily permit one jump to that conclusion.  Defendants offer no evidence

that plaintiff's oral objections posed such a threat or otherwise created a need that plaintiff be

shoved into a wall in order for discipline to be restored.

Defendant Rath next argues that plaintiff does not allege any injury suffered as a result of

defendant Rath's conduct.  *See Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) ("An inmate who

complains of a push or shove that causes no discernible injury almost certainly fails to state a

valid excessive force claim.").  To the contrary, the amended complaint states that the push

"knocked the breath out of [plaintiff] and caused excruciating pain to his back."  Dckt. No. 13 at

15.  Defendant Rath notes that plaintiff's medical records do not include a reference to an injury

suffered as the result of being pushed into a wall by defendant Rath.  That plaintiff may not have

1   sought medical treatment is relevant to the credibility of plaintiff's claim of injury and the extent

2   of that injury.  Indeed, a jury may well accept defendant's version of what happened and

3   conclude that plaintiff's testimony is not credible.  However, at the summary judgment stage, the

4   court cannot weigh plaintiff's credibility and resolve genuine disputes over factual issues.

5   Rather, the court must take accept plaintiff's version of what occurred and must draw all

6   reasonable inferences in his favor.  If a reasonable jury could credit plaintiff's version over the

7   defendants' version, summary judgement must be denied.  At trial, if plaintiff's account as to

8   what occurred and what force was used is credited, a jury could reasonably find for plaintiff on

9   his claim of excessive force  Accordingly, summary judgment on Claim 8 is not warranted.

10        I.       **Claim 9 - Eighth Amendment (Conditions of Confinement)**

11             Plaintiff alleges that defendants Felker, McDonald, and Perez implemented or enforced

12   an "underground policy of forcing prisoners to walk around the institution in their underwears

13   [sic], regardless of weather condition."  Dckt. No. 13 at 26-27.

14             Liability under § 1983 may be imposed on supervisors like defendants Felker,

15   McDonald, and Perez (HDSP wardens) if:  (1) the supervisor personally participated in the

16   deprivation of constitutional rights, or (2) the supervisor knew of the violations and failed to act

17   to prevent them, or (3) the supervisor implemented a policy "so deficient that the policy itself 'is

18   a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'"

19   *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991).

20             Defendants argue that plaintiff cannot provide any evidence of the policy he alleges,

21   because there was none.  Plaintiff responds that several of defendants' discovery responses

22   evidence such a policy.  First, defendant Laguna's interrogatory responses state that a prisoner in

23   the institution's Correctional Treatment Center ("CTC") is allowed to wear boxers, a t-shirt, and

24   soft shower-type shoes.  Dckt. No. 88-1 at 66-68.  Staff in the CTC do not issue pants or shirts to

25   a prisoner being discharged to be escorted to administrative segregation.  *Id.*  Defendants Koenig

26   and Perez responded in discovery that each had witnessed prisoners being escorted through the

1   institution, including out-of-doors, in underwear.  Dckt. No. 88-1 at 66-72.  Defendant

2   McDonald responded in discovery that, in emergency situations, inmates may be escorted "in

3   clothing which is not commensurate with their current housing status."  *Id.* at 73-74.

4       This evidence, even viewed in the light most favorable to plaintiff, does not show an

5   institutional policy of escorting prisoners in their underwear regardless of weather.  Rather, the

6   evidence indicates at most that sometimes inmates are escorted in their underwear and that such

7   escorts are permitted in emergency situations.  (Defendant Perez additionally responded to

8   plaintiff:  "I do not allow Inmates to be transferred from facility to facility in their underwear.  I

9   am not saying that it has never happened, but the expectation is that Inmates are dressed

10  appropriately for conditions when transferred between facilities."  Dckt. No. 881 at 71.)  While

11  plaintiff allegedly was transported from CTC to administrative segregation in his underwear on

12  one occasion, plaintiff's evidence does not show an institutional policy promulgated or enforced

13  by defendants Perez, McDonald, and/or Felker that was the "moving force" behind that incident.

14  Accordingly, summary judgment should be granted as to Claim 9 in favor of defendants

15  McDonald, Felker, and Perez.

16      **J.      Claim 10 - Eighth Amendment (Conditions of Confinement, Deliberate
            Indifference)**

17

18      Plaintiff alleges that, on or about December 21, 2005, defendant Dillard escorted plaintiff

19  from the CTC back to administrative segregation.  Dckt. No. 13 at 25.  Plaintiff told defendant

20  Dillard that he had gout, a swollen left foot, shoulder pain, and no clothing.  *Id.*  Plaintiff also

21  told defendant Dillard that he had a "waistchain chrono" and needed crutches.  *Id.*  Defendant

22  Dillard responded that the administrative segregation and CTC sergeants had ordered that

23  plaintiff be transported with handcuffs and no crutches.  *Id.*  Defendant Dillard forced plaintiff to

24  wear the handcuffs and walked him outside wearing only his underwear and "Chinese slippers"

25  as defendant Laguna watched.  *Id.* at 26.  Defendant Dillard forced plaintiff to limp a half mile

26  from CTC to administrative segregation in a 30° blizzard.  *Id.*  It took over an hour to reach the

1  administrative segregation unit.  *Id.*  When he arrived, plaintiff had no feeling in any part of his

2  body.  *Id.*

3         Claim 10 is a hybrid conditions-of-confinement and denial-of-medical care claim, as

4  plaintiff alleges both that he needed certain medical accommodations that were not provided and

5  that he was exposed to impermissible conditions of confinement.  The elements of a conditions-

6  of-confinement claim have been stated above.  To succeed on an Eighth Amendment claim

7  predicated on the denial of medical care, a plaintiff must establish that he had a serious medical

8  need and that the defendant's response to that need was deliberately indifferent.  *Jett v. Penner*,

9  439 F.3d 1091, 1096 (9th Cir. 2006); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A

10  serious medical need exists if the failure to treat plaintiff's condition could result in further

11  significant injury or the unnecessary and wanton infliction of pain.  *Jett*, 439 F.3d at 1096.  An

12  officer has been deliberately indifferent if he was (a) subjectively aware of the serious medical

13  need and (b) failed to adequately respond.  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

14  Deliberate indifference may be manifested by a prison official's intentional interference with a

15  prisoner's medical treatment.  *Jett*, 439 F.3d at 1096.

16         Defendants first argue that the conditions plaintiff complains of were not sufficiently

17  serious to violate the Eighth Amendment.  Once again, however, defendants provide speculation

18  rather than evidence to support this argument.  Defendants speculate, "If the weather was

19  significantly cold, and there were other means of transportation available, it reasons that

20  Defendant Dillard would not have made the walk himself."  Dckt. No. 77 at 43.  This argument

21  is speculative and ignores the obvious fact that a fully-clothed individual and an individual in his

22  underwear will experience cold weather differently.  Plaintiff states that defendant Dillard was

23  wearing a winter coat, hat, gloves, and boots.  Dckt. No. 88 at 17.

24  /////

25  /////

26  /////

1    Defendants next speculate that "at an average pace one could walk a half a mile in

2    approximately ten minutes" and argue that such a short exposure to extreme weather should not

3    violate the Constitution.  *Id.*  Plaintiff attests, however, that the walk took over an hour.  Dckt.

4    No. 13 at 26.

5    Defendants argue that plaintiff was not diagnosed with foot problems until six or so

6    weeks after the incident.  From this they speculate that he was not suffering from pain at the time

7    and therefore, presumably, needed no accommodation and could walk the distance between CTC

8    and administrative segregation without difficulty.  Defendants' evidence on this point is not

9    clear, however.  Plaintiff's medical chart from January 12, 2006 indicates that he was prescribed

10   medication for pain, and the source of the pain is not noted.  Dckt. No. 77-3 at 2.  Plaintiff's

11   treating physician declares only that the chart lacks any note that plaintiff complained of foot

12   pain, not that plaintiff did not do so.  Dckt. No. 77-2 at 41.  The medical evidence shows that the

13   left foot was swollen on February 2, 2006 and that, after an x-ray, his treating physician thought

14   he may have arthritis or gout.  *Id.*  Plaintiff attests that he suffered gout, foot pain, and shoulder

15   pain, and that he required crutches.  Dckt. No. 13 at 25; *see also* Dckt. No. 88-1 at 76-78

16   (January 5, 2006 medical record documenting plaintiff's "past history of gout in the left leg and

17   foot").

18   Defendants next argue that plaintiff's claim should fail because there is no evidence that

19   he suffered any injury as a result of the transport.  However, plaintiff attests that he experienced

20   extreme pain in his foot, pain in his shoulder, was "freezing," and became "extremely sick" from

21   the exposure.  Dckt. No. 13 at 26-27; Dckt. No. 88 at 17.  While the absence from plaintiff's

22   medical charts of any mention of an injury that is expressly attributed to the transport may

23   impact how a trier of fact assesses the credibility of plaintiff's testimony, it does not establish

24   that it is undisputed that there was no injury.

25   Lastly, defendants argue that plaintiff seeks to impose supervisory liability on defendant

26   Laguna, which is impermissible in § 1983 actions.  Plaintiff's verified allegations, however, are

33

1    not simply that defendant Laguna was defendant Dillard's supervisor.  Rather, plaintiff attests

2    that defendant Laguna watched defendant Dillard force plaintiff into handcuffs and walk him

3    outside into "a thirty degree blizzard" in his underwear and "Chinese slippers" to be escorted

4    from CTC to administrative segregation.  Dckt. No. 13 at 26.  The Ninth Circuit has held that "a

5    prison official can violate a prisoner's Eighth Amendment rights by failing to intervene" to

6    prevent another official's violation.  *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995).

7    Accordingly, a defendant-officer may be held liable for failing to intervene when he had enough

8    time to observe what was happening and to intervene and prevent or curtail the violation, but

9    failed to do so.  *See Lanier v. City of Fresno*, 2010 U.S. Dist. LEXIS 130459, 2010 WL

10   5113799, at *6 (E.D. Cal. Dec. 8, 2010) (citations omitted).  Plaintiff's verified allegations are

11   sufficient to create a triable dispute as to whether defendant Laguna personally was aware of and

12   failed to intervene to prevent defendant Dillard's allegedly unconstitutional conduct.

13   Accordingly, summary adjudication of Claim 10 is not warranted.

14         **K.      Claim 11 - First Amendment (Retaliation)**

15         Plaintiff alleges that defendants Dillard and Laguna were motivated in the conduct

16   described in Claim 10 by their knowledge of and intent to retaliate for plaintiff's "protected

17   conduct."  Dckt. No. 13 at 39.  According to plaintiff, their conduct did not advance a legitimate

18   penological objective and caused plaintiff to suffer "a chilling effect of government action."  *Id.*

19         Defendants argue that the amended complaint is devoid of any retaliation claims related

20   to the transport from CTC to administrative segregation.  In the "Count Four" section of the

21   amended complaint, plaintiff alleges that the defendants involved in Claims 9 and 10 were

22   motivated by plaintiff's "protected conduct."  Dckt. No. 13 at 39.  However, plaintiff has come

23   forward with no further percipient facts or evidence indicating that defendants Dillard and

24   Laguna knew of plaintiff's protected conduct and were motivated by that protected activity in

25   allegedly failing to adequately clothe and accommodate plaintiff for the transport from CTC to

26   administrative segregation.  *See Corales*, 567 F.3d at 568.  Accordingly, plaintiff has failed to

34

1    raise a triable issue that he was transported in the manner alleged because of his protected

2    conduct, and summary judgment should be granted in favor of defendants Dillard and Laguna as

3    to Claim 11.

4        **L.**       **Claim 12 - Eighth Amendment (Conditions of Confinement, Deliberate
5                     Indifference)**

6        Plaintiff alleges that defendant Koenig greeted plaintiff at the administrative segregation

7    unit after his escort by defendant Dillard from CTC.  Dckt. No. 13 at 26.  Koenig allegedly

8    smiled, indifferent to plaintiff's pain and suffering.  *Id.*  Plaintiff claims that he became

9    extremely sick.  *Id.* at 27.

10       Defendants claim that, while Koenig was a sergeant on duty in administrative segregation

11   when plaintiff arrived on December 21, 2005, another correctional officer processed plaintiff

12   back into the unit by placing him in a cage, strip searching him, and returning him to his cell.

13   DUF 33, 34.  For the purposes of this motion, Koenig does not dispute that he smiled when

14   plaintiff arrived.  DUF 32.  Defendants claim that plaintiff testified in his deposition that he was

15   provided "shoes, a top and bottoms after his strip search."  DUF 35.  However, a review of the

16   deposition transcript shows only that plaintiff had "extremely light" "Chinese shoes," a t-shirt,

17   and boxer shorts.  Dckt. No. 77-1 at 19.

18       Defendant Koenig argues that there is no evidence that plaintiff faced an excessive risk to

19   his health or safety.  Plaintiff states that he arrived at the administrative segregation unit after

20   walking for an hour in a blizzard "numb and aching all over from the frigid climate."  Dckt. No.

21   88 at 17.  Plaintiff's testimony as to the weather conditions, the length of his exposure to the

22   cold, and Koenig reaction to plaintiff's complaints raises a triable issue of material fact as to

23   whether plaintiff faced an unreasonable and excessive risk of harm.

24       Defendant Koenig next argues that there is no evidence that he was aware of any such

25   risk.  Plaintiff's facts, however, are that he arrived at the administrative segregation unit very

26   poorly clothed from traversing some distance in a blizzard and that defendant Koenig responded

by smiling.  Drawing all inferences in plaintiff's favor, a reasonable jury could find on these facts defendant Koenig was aware that plaintiff faced an excessive risk to his health from his exposure to the cold weather.

Lastly, defendant Koenig argues that he cannot be held liable under a respondeat superior theory for the conduct of the corrections officer who processed plaintiff back into the unit.  The undisputed facts are that defendant Koenig himself was present at plaintiff's arrival.  His alleged failure to personally take action necessary to reasonably respond to plaintiff's condition is not premised on any alleged misconduct by the corrections officer.  Accordingly, summary judgment must be denied as to this claim.

### M.      Claim 13 - Eighth Amendment (Deliberate Indifference)

In Claim 13, plaintiff alleges that a number of medical care providers were deliberately indifferent to his serious medical needs.  First, plaintiff alleges that, in January 2006, while plaintiff was housed in CTC, defendants James and Cox (both doctors) noticed that his left foot, ankle, and leg were swollen, due to an injury to plaintiff's left big toe.  Dckt. No. 13 at 27, 41-42.  Plaintiff claims that defendants James and Cox were aware that plaintiff was experiencing immense pain and could not walk under his own power.  *Id.*  Plaintiff alleges that, nevertheless, they did not provide plaintiff any kind of medical care for his foot, and plaintiff's foot condition continued to worsen.  *Id.*  Plaintiff claims that when he was discharged from CTC, his foot had swelled to twice its normal size.  *Id.* at 28.  Plaintiff alleges that he had to hop around his housing unit for weeks before receiving an ultrasound at an outside hospital.  *Id.*

Second, plaintiff alleges that in June 2006, an osteopath recommended that he receive a "soft boot" for his left foot due to its swollen size.  *Id.*  Defendant Harvey (a podiatrist) allegedly acknowledged plaintiff's swollen foot on or about July 26, 2006, but refused to recommend that plaintiff be afforded a soft boot chrono.  *Id.*  Plaintiff claims that defendant Harvey told plaintiff that she made her money by administering "injection blocks" to inmates and that she would only help plaintiff with a soft boot if he accepted her blocks on a monthly basis.  *Id.* at 28.  When

1  plaintiff refused defendant Harvey's "injection therapy," she allegedly became angry, falsified

2  plaintiff's medical records to reflect that his foot condition was alcohol-related, and kicked

3  plaintiff out of her office. *Id.* at 28-29.

4      Lastly, plaintiff claims that he told defendant Roche about his experience with defendant

5  Harvey. *Id.* at 29.  According to plaintiff, defendant Roche knew that plaintiff's foot condition

6  was serious, but did nothing. *Id.*

7      As noted above, to succeed on an Eighth Amendment claim predicated on the denial of

8  medical care, a plaintiff must establish that he had a serious medical need and that the

9  defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096.  A serious

10 medical need exists if the failure to treat plaintiff's condition could result in further significant

11 injury or the unnecessary and wanton infliction of pain. *Id.*  An officer has been deliberately

12 indifferent if he was (a) subjectively aware of the serious medical need and (b) failed to

13 adequately respond. *Farmer*, 511 U.S. at 828.  Deliberate indifference may be manifested by a

14 prison official's intentional interference with a prisoner's medical treatment. *Jett*, 439 F.3d at

15 1096.

16     A defendant's negligence does not constitute deliberate indifference (thus, conduct that

17 falls within the standard of care also necessarily comports with the Eighth Amendment). *Estelle*,

18 429 U.S. at 106.  Nor does a plaintiff's general disagreement with the treatment he received. *Id.*;

19 *Jackson v. McIntosh*, 90 F.3d 330, 331 (9th Cir. 1996); *Hutchinson v. United States*, 838 F.2d

20 390, 394 (9th Cir. 1988).  Evidence that medical caregivers disagreed as to the need to pursue

21 one course of treatment over another is also insufficient, by itself, to establish deliberate

22 indifference. *Jackson*, 90 F.3d at 332.  Rather, the plaintiff must show that defendants were

23 aware of the risk of harm and that their response to the risk was medically unacceptable under

24 the circumstances. *Id.*

25 /////

26 /////

I.      **Allegations Against Defendants James and Cox**

Defendant James argues that he was not deliberately indifferent to plaintiff's medical needs because he examined plaintiff, ordered x-rays and an ultrasound, and referred plaintiff to a specialist between January and July 2006.  Cox does not recall providing any treatment to plaintiff, and argues that plaintiff received adequate treatment from multiple other care providers.  Defendant James declares that he saw plaintiff on January 12, 2006 to discharge plaintiff from CTC, because plaintiff had ended a hunger strike.  Dckt. No. 77-2 at 41.  James declares that his chart notes from that date do not mention any complaints by plaintiff regarding his left foot, but plaintiff was given ibuprofen for pain.  *Id.*; *see* Dckt. 77-3 at 2 (January 12, 2006 chart notes).

Plaintiff has submitted a comprehensive examination report authored by James on January 5, 2006, inexplicably not addressed by defendant James in his declaration and exhibits. Dckt. No. 88-1 at 76-78.  In that document, defendant James reported, "The patient does also have a past history of gout in the left leg and foot and has been placed recently on colchicine 0.6 mg t.i.d. two hours apart until the pain stops and then Tylenol for pain."  *Id.*  Colchicine is a medicine used to treat gout.  Nat'l Inst. of Health "MedlinePlus", http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682711.html (last checked May 25, 2013).[6] Plaintiff further states that, in the January 12, 2006 examination, both defendants Cox and James disregarded his painful swollen left foot and painful left shoulder, saying they were only interested in plaintiff's hunger strike.  Dckt. No. 88 at 19.  According to plaintiff, defendants did not provide plaintiff with a crutch, cane, or a sling for his shoulder, and plaintiff was forced to hop on his right foot everywhere until he obtained crutches on January 24, 2006.  *Id.* at 19-20; Dckt. 88-1 at 80-81 (health care services requests submitted by plaintiff on January 19 and 24, 2006 complaining that his left leg and foot were swollen and very painful from gout); *id.* at 82

---

[6] The court takes judicial notice of the National Institute of Health's online drug information service entry on colchicine under Federal Rule of Evidence 201(b)(2).

1   (form notation by an unknown healthcare provider dated January 24, 2006 indicating that

2   plaintiff's left ankle and foot were swollen).  On February 3, 2006, nearly one month from the

3   January 5th appointment, defendant James made an urgent request for an ultrasound of plaintiff's

4   swollen left foot, ankle, and lower leg.  Dckt. No. 77-2 at 41; Dckt. No. 88-1 at 83-84.  Viewed

5   in the light most favorable to plaintiff, this evidence raises a triable issue regarding whether

6   defendants James and Cox knew plaintiff was suffering from painful gout in his left leg and foot

7   in early January 2006 but refused to provide or delayed adequate treatment.  Thus, summary

8   judgment must be denied as to Claim 13 regarding defendants James and Cox.

9                    **ii.    Allegations Against Defendant Harvey**

10          Defendant Harvey argues that the undisputed facts show simply that plaintiff disagreed

11   with her diagnosis (peripheral neuropathy) and proposed treatment (nerve block injections),

12   which does not amount to her deliberate indifference to his serious medical needs.  Rather,

13   defendant Harvey argues, she performed a thorough exam of plaintiff's left foot.  She concluded

14   in her exam report that plaintiff's pain was more likely due to neuropathy than gout because

15   plaintiff reported that, prior to incarceration, he drank heavily and because he had "x-ray changes

16   without a history of multiple gouty attacks and normal uric acid level."  Dckt. No. 88-1 at 100-

17   01; *see also* Dckt. No. 77-3 at 26-29 (declaration of defendant Harvey).

18          Plaintiff attests, on the other hand, that defendant Harvey refused to recommend that

19   plaintiff be issued permission for a soft boot despite observing plaintiff's swollen foot and

20   despite a different medical provider's recommendation the prior month that he use a soft boot.

21   Dckt. No. 13 at 28.  Plaintiff attests that defendant Harvey so refused because plaintiff declined

22   her offer of nerve block injections, informing plaintiff that she made her money off

23   administering the injections.  *Id.* at 28-29.  According to plaintiff, defendant Harvey falsified her

24   report in stating that plaintiff reported heavy drinking prior to incarceration (a fact supporting

25   her diagnosis of neuropathy) out of anger when plaintiff refused the injections.  *Id.*  Plaintiff's

26   medical records show that he was diagnosed with gout early in 2007 and given permission for a

1  soft boot in early 2008.  Dckt. No. 88-1 at 102-04, 106-08.  Plaintiff later received nerve block

2  injections from defendant Harvey but did not experience pain relief, which, according to

3  defendant Harvey, "indicated that the pain is not likely due to neuropathy," Dckt. No. 77-3 at 28.

4           At this stage of the proceedings, the court cannot weigh the credibility of plaintiff and

5  defendant Harvey to determine whose account of the July 2006 exam is credible.  Viewing the

6  evidence in plaintiff's favor, plaintiff has raised a triable issue as to whether defendant Harvey

7  was deliberately indifferent to his foot condition and need for a soft boot recommendation.

8  Accordingly, summary judgment in favor of defendant Harvey is not warranted.

9                    **iii.   Allegations Against Defendant Roche**

10          Plaintiff alleges that he notified defendant Roche of defendant Harvey's alleged

11  misconduct but Roche did nothing.  Roche argues that he never provided medical treatment to

12  plaintiff.  DUF 55.  Plaintiff has provided evidence, however, that Roche reviewed an appeal

13  plaintiff filed regarding the treatment he had received from defendants James and Cox in January

14  2006.  Dckt. No. 88 at 21-22.   Roche responds that he should be entitled to qualified immunity

15  for his conduct in reviewing the appeal.  The court agrees.

16          State officers sued under § 1983 are entitled to qualified immunity unless they violate

17  "legal rules that were clearly established at the time [the action] was taken."  *Pearson v.*

18  *Callahan*, 555 U.S. 223, 244 (2009).  "Although a plaintiff need not show that 'the very action in

19  question has previously been held unlawful,' qualified immunity is appropriate unless 'in light of

20  pre-existing law the unlawfulness [is] apparent.'"  *Pogue v. Igbinosa*, No. 1:07cv-01577-GMS,

21  2012 U.S. Dist. LEXIS 23150, at *27 (E.D. Cal. Feb. 23, 2012) (quoting *Kennedy v. City of*

22  *Ridgefield*, 439 F.3d 1055, 1065 (9th Cir. 2006)).

23          A divergence of opinion has arisen among the district courts in the Ninth Circuit

24  regarding whether plaintiffs may premise a constitutional claim against state officers based on

25  their conduct in reviewing an inmate appeal.  *See id.* at *23-24.  Some recent cases have allowed

26  such claims where the reviewing officer was a medical professional and the claim centered on

1   the denial of medical care.  *Id.*  The court is not aware of any such case from the time of

2   defendant Roche's conduct in 2006, however.  *See id.* at 27-28 (stating that the plaintiff had

3   failed to identify any case prior to 2009 allowing a claim to proceed against an officer based on

4   his review of an inmate appeal).  Because it was not apparent in 2006 that defendant Roche's

5   conduct in reviewing plaintiff's appeal could be considered a violation of plaintiff's

6   constitutional rights, Roche should be granted qualified immunity.

7            **N.     Qualified Immunity - All Defendants**

8            Defendants argue generally that they should be granted qualified immunity because the

9   undisputed facts show that none of them violated the Constitution.  The argument is predicated

10  on the same contentions defendants raised in claiming that there are no genuine disputes as to

11  any material facts regarding the merits of each of plaintiff's claims.  For the reasons that precede,

12  the court concludes that the material facts are disputed on a number of plaintiff's constitutional

13  claims, and thus the court cannot grant qualified immunity to all defendants on that basis.  As

14  discussed above, where the undisputed facts show no constitutional violation, summary

15  judgment has been recommended.  Where material issues of fact preclude summary judgment as

16  to other claims, denial of summary judgment has been recommended.  That same analysis

17  applies to the defendant's generalized argument for qualified immunity here.

18           Defendants next broadly argue that, "[b]ased on the[] undisputed facts, the law would not

19  have put the Defendants on notice that their actions would be clearly unlawful."  Dckt. No. 77 at

20  58.  This undeveloped argument do not include a discussion of the law or facts pertaining to each

21  claim or explain why each of their actions were not clearly unlawful.  Rather, it appears to be

22  another broad brush argument that there are not genuine factual disputes as to the merits of

23  plaintiffs claims that his rights were knowingly and intentionally violated for the reasons

24  discussed above.  Accordingly, defendants (other than defendant Roche) have not established

25  that they are entitled to qualified immunity.

26  /////

**O.     Note**

In many instances through their points and authorities, defendants ask for the opportunity to brief certain claims if the court rejects their arguments on those claims.  This suggests that defendants either did not take their own motion seriously, or have not read Local Rule 230 regarding the time for filing points and authorities in support of a motion.  Defendants had the opportunity to raise any arguments they had at their disposal in favor of summary judgment in their brief in support of the motion.  They also had the opportunity to-- and did--file a brief in reply to the plaintiff's opposition.  Accordingly, the court has addressed the motion on the basis of the current record and briefing.

**IV.     Recommendation**

For all of the above reasons, it is RECOMMENDED that defendants' motion for summary judgment (Dckt. No. 77) be granted in part and denied in part as follows:

    1.     Claim 1 – granted;

    2.     Claim 2 – granted as to plaintiff's allegations regarding *Chatman v. Rianda*, Kings County Case No. 02CV7140, and otherwise denied;

    3.     Claim 3 – granted as to defendant Avila and otherwise denied;

    4.     Claim 4 – denied;

    5.     Claim 5 – granted;

    6.     Claim 6 – denied;

    7.     Claim 7 – granted as to defendant Ross and otherwise denied;

    8.     Claim 8 – denied;

    9.     Claim 9 – granted;

    10.     Claim 10 – denied;

    11.     Claim 11 – granted;

    12.     Claim 12 – denied; and

/////

1    13.    Claim 13 – granted as to defendant Roche and otherwise denied.

2    These findings and recommendations are submitted to the United States District Judge

3    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

4    after being served with these findings and recommendations, any party may file written

5    objections with the court and serve a copy on all parties.  Such a document should be captioned

6    "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

7    within the specified time may waive the right to appeal the District Court's order.  *Turner v.*

8    *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

9    Dated:  July 23, 2013.

10

11                    EDMUND F. BRENNAN
                      UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26